## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

TEGO, INC.,

        Plaintiff,

v.

MAINTAG, INC.,

        Defendant.

Case No. 1:13-cv-02241-TWT

## DEFENDANT'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION TO COMPEL ARBITRATION AND STAY OF ACTION

## INTRODUCTION

Defendant MAINtag, Inc. submits this reply memorandum of law in further support of its motion to dismiss this action or, in the alternative, to compel arbitration and to stay this action.  In opposing the motion, Plaintiff Tego, Inc. ("**Plaintiff**" or "**Tego**") advanced three principal arguments: (1) that "merger" language in the invoice Tego issued months after the transaction at issue expressly was agreed,  and also after it was performed, precludes reference to the Liability Agreement which concededly obliges Plaintiff to arbitrate disputes in France; (2) that the transaction does not fall within the Liability Agreement; and (3) that Defendant Maintag, Inc. cannot invoke the arbitration provision of the Liability Agreement (the "**Arbitration Provision**").  As shown below, the documentary

evidence before the Court, including documents annexed to the Plaintiff's Complaint, contradicts these assertions.  In the circumstances, the discovery Plaintiff seeks in the alternative would serve no purpose but to circumvent the Federal Arbitration Act.  Moreover, because no amendment could cure these contradictions, Plaintiff's further alternative request for leave to replead would be futile.

## ARGUMENT

## I.  THE MERGER CLAUSE IN THE INVOICE IS INEFFECTIVE TO PRECLUDE ARBITRATION.

### A.  The Liability Agreement Bars Amendment Without Mutual Signatures.

Plaintiff's CEO concedes the existence and validity of the Liability Agreement, a copy of which was Annexed as Ex. A to the Declaration of Bruno Lo-RE dated August 7, 2013 ("**Lo-RE Decl.**").  See Declaration of Timothy P. Butler dated August 27, 2013 ("**Butler Decl.**"), ¶ 10.  Tego therefore also acknowledges Section 8.1 of that agreement, which states:  "This contract shall not be amended except by specific agreement in writing signed by the duly authorized representatives of the Parties."  The later invoice (the "**Invoice**") containing the merger language on which Plaintiff relies is not signed by any of Tego, MAINtag S.A.S. or Defendant MAINtag, Inc.

2

The Georgia Court of Appeals has interpreted the Uniform Commercial Code's Statute of Frauds as having "three definite and invariable requirements" for writings to be sufficient: (1) "it must evidence a contract for the sale of goods", (2) it must be signed by the party against whom enforcement is sought, and (3) "it must specify a quantity." *See Jinright v. Russell,* 123 Ga. App. 706, 708, 182 S.E.2d 328 (1971). Because none of MAINtag S.A.S., Defendant MAINtag, Inc. and Tego signed the Invoice that Plaintiff relies on for its merger clause argument, the Invoice violates the Uniform Commercial Code's Statute of Frauds. As such, the Invoice cannot serve as an instrument to avoid the Liability Agreement, including its clear Arbitration Provision, which both parties executed and governs the existing business relationship. It follows that the Invoice cannot be effective as an amendment to the Liability Agreement's agreement for arbitration.

### B. The Invoice's Purported Addition of a Merger Clause Did Not Happen Within a "Reasonable" Time.

Even if the purported merger clause were not precluded by both the Liability Agreement and Georgia law, it still would be ineffective for a further reason. Assuming the applicability of the Uniform Commercial Code to the

transaction at issue[1], U.C.C. § 2-207 permits a "battle of the forms" modification of a commercial arrangement not evidenced by a signed agreement, as between merchants, only if it is done within a "reasonable time."  U.C.C. § 1-204.

Here, the Invoice was created so long after the originally agreed transaction, *i.e.,* the exchange of Order and Quote (Complaint Ex. A) that Plaintiff defines as the Agreement, Pl. Br. at 4 – nearly four months – that, as a matter of law, it cannot be said to have occurred within a "reasonable" time.  Tego did not send the Invoice within a reasonable time after the parties executed the sale of the chips.  Tego did send a written confirmation to MAINtag S.A.S. (not Maintag, Inc.) in the form of a copy of its "Quote" on December 3, 2012, and MAINtag S.A.S. (not Maintag, Inc.) responded in writing by its "Order" on December 7, 2012. This would have been the reasonable time to include proposed additional terms such as the merger clause in the Invoice.  Sending the Invoice nearly four months later and after partial payment simply is not reasonable within the meaning of the U.C.C.  *See Coastal & Native Plant Specialties, Inc. v. Engineered Textile Prods., Inc.,* 139 F. Supp. 2d

---

[1] As noted in Point III, *infra*, aspects of the documents Plaintiff annexed to its Complaint and which it characterized as the Agreement suggest it may not have been intended that it be governed by the U.C.C., but by the "Incoterms" of the International Chamber of Commerce (which also is the arbitration seat under the Arbitration Provision).

1326, 1337-1338 (N.D. Fla. 2001) (citing cases stating that sending the invoice after the consummation of the sale is not binding upon the purchaser because the invoice was not sent within a reasonable time within the meaning of UCC § 2-207(1)). Moreover, the purported modification came only after performance under the agreement between the parties already had begun, including conceded partial payment by Defendant MAINtag, Inc. to Plaintiff. At the time the Invoice was sent (March 6, 2013), Plaintiff had completely performed its obligations under the contract by shipping the goods (on March 5, 2013). To allow a seller to make proposals for additions to a contract it already has completely performed would work an injustice on the buyer, who in this case had accepted the goods on the basis of the terms agreed to orally. *See id.* at 1335. In similar circumstances, the doctrine of estoppel has been held to preclude such a purported unilateral change to the contract. *See, e.g.*, *J. Lee Gregory, Inc. v. Scandinavian House, L.P.*, 209 Ga. App. 285, 289 (1993) (in rejecting a party's effort to undo a contract by objecting to the manner of payment after it had issued a letter of intent and permitted the counter-party to start work, the Georgia Court of Appeals found that "the conduct of the parties demonstrates an intention to contract") (citing O.C.G.A. § 11-2-207(3))). Additionally, a change to a jurisdiction provision of a contract between merchants (as here, where Plaintiff argues the merger language changes the proper

forum from a French arbitral tribunal) has been held to be a material alteration under O.G.C.A. § 2-207(2), making it ineffective. *See Matter of Sweetapple Plastics, Inc.*, 77 B.R. 304, 309 (Bankr. M.D. Ga. 1987).

Accordingly, for these two independent reasons, the merger clause upon which Plaintiff relies to avoid arbitration is ineffective to achieve that result.

II.   **PLAINTIFF HAS NOT SHOWN THAT THE ORDER AT ISSUE FALLS OUTSIDE THE LIABILITY AGREEMENT.   DOCUMENTS PLAINTIFF ANNEXED TO ITS COMPLAINT SHOW THE CONTRARY.**

Plaintiff's second argument resisting the pending motion is that the order at issue does not fall within the Liability Agreement, and therefore cannot be subject to the Liability Agreement's arbitration provision.  Tego marshals two factual bases for its argument: (1) the purported inconsistency of the pricing specified in the Order and Quote, documents annexed to the Complaint, with the pricing specified in the Liability Agreement; and (2) that unidentified and unsworn individuals at Airbus have told Plaintiff's CEO the goods at issue were not within the Liability Agreement.

Plaintiff's first argument is contradicted by the documents it annexed to the Complaint.  Annex A to the  Liability Agreement provides that the per unit pricing for the chips in the transaction at issue would be $6.38 for orders with quantities up

to 25,000, and $5.70 for orders with quantities up to 50,000.   Those are exactly the prices outlined in the Invoice on which Plaintiff relies to oppose the pending motion.

Plaintiff's second argument is curious.   MAINtag S.A.S. has the direct relationship with Airbus and is the supplier of the tags to the aircraft manufacturer or its contractors.   It follows that MAINtag S.A.S. is in a better position than Tego to know the answer to the question of whether the items were supplied under the Liability Agreement.   Airbus, after all, is not a party to that agreement.   Plaintiff itself cannot (and does not) say whether the goods at issue fall within the Liability Agreement.   Instead, it offers only the unsworn, hearsay purported statements of unidentified Airbus personnel to counter Mr. Lo-RE's direct assertion.   Again, this contention is contradicted by a document Plaintiff annexed to its Complaint in Ex. C.   The April 4, 2013 e-mail from Tego's Su Ahmad to Mr. Lo-RE (copied to Mr. Butler at Tego) threatened to notify "Airbus next week of your non-payment . . . so that Airbus can be aware that the further supply of tags could be affected going forward."

Finally, in his Reply Declaration dated September 11, 2013 (the "**Lo-RE Reply Decl.**")[2], Mr. Lo-RE affirms that the Liability Agreement was entered into at the demand of Airbus and that all items which are the subject of this dispute were ordered by MAINtag S.A.S. with the intention that they be provided to Airbus.

In short, Plaintiff has failed to overcome the documentary record showing that this transaction is subject to the arbitration provision of the Liability Agreement.

## III.   IN THE CIRCUMSTANCES, MAINTAG, INC., A SUBSIDIARY OF MAINTAG S.A.S., CAN INVOKE THE ARBITRATION PROVISION.

Plaintiff's final argument is that Defendant Maintag, Inc. was not a party to the Liability Agreement and therefore lacks standing to enforce the arbitration provision it contains.  By Plaintiff's own assertions, however, this argument fails.

Plaintiff's CEO has stated that Tego did not distinguish between the parent entity (and party to the Liability Agreement), MAINtag S.A.S., and Defendant MAINtag, Inc.: "Tego always believed it was doing business with a company named MAINtag that had its U.S. headquarters in Atlanta, Georgia and its European headquarters in Paris, France  . . . ."  Butler Decl., ¶ 15.  Indeed, before

---

[2] Lo-Re Reply Decl. incorporated herein and attached hereto as Exhibit A.

Plaintiff brought suit, its non-litigation counsel twice told MAINtag S.A.S. that Plaintiff would pursue its litigation in the U.S. and/or France. *See* Complaint Exs. C, E. Without its awareness of France-based MAINtag S.A.S.'s involvement, there would have been no basis for Tego to consider a claim in France. Further, the documents annexed to the Complaint never refer to Defendant MAINtag, Inc. nor to an address for a "MAINtag" entity in Georgia or anywhere else in the United States.

There are further indications in the documents annexed to the Complaint that Tego knew the transaction involved a counterparty in France, not Georgia. For example, the documents use terms developed by the Paris-based International Chamber of Commerce for commercial agreements ("**FCA**"), not those of the Uniform Commercial Code. *See* footnote 1, *supra*, and Lo-RE Reply Decl. ¶ 5 and Ex. C. Moreover, a non-boilerplate part of the Invoice specified that the customer ("MAINtag") is responsible for all taxes and duties. But if the transaction had been a purely domestic one, between a Massachusetts corporation (Plaintiff) and a Georgia one (Defendant), as Plaintiff claims, there would have been no occasion to provide for payment of duties because none would have applied. Yet, French duties were paid by MAINtag S.A.S., again showing Plaintiff understood it was dealing with MAINtag S.A.S. Annexed as Ex. A to the Lo-RE Reply Decl. is a

document   establishing the payment by MAINtag S.A.S. of French duties exceeding 50,000 euros on the order.

Most tellingly, a pro-forma invoice (also attached as part of Ex. A to the Lo-RE Reply Decl.), which was issued by Tego's shipper Syagrus Systems for the purposes of assessing customs duties, refers to the same quantities of wafers/units as those set forth in the Invoice and expressly states: "These commodities are authorized by the U.S. Government **for export only to France** for use by KATHLEEN LE BAIL." (Emphasis supplied.) As the Court will easily identify from the face of the documents in Lo-RE Reply Decl. Ex. A, Ms. Le Bail is a MAINtag S.A.S. employee. This pro-forma invoice thus establishes that the goods were shipped on March 5, 2013, before the Invoice was created on March 6, 2013; that they were shipped to France, not Georgia; that French customs duties were paid by the consignee; and that the consignee was MAINtag S.A.S.

Above all, however, Plaintiff has acknowledged that it treated "MAINtag" as one entity with two headquarters. They are two different entities, however. *See* Lo-Re Reply Decl. ¶ 8 and Exs. D and E. Nevertheless, there was only one transaction, so the facts affecting the two MAINtag companies are identical and inseparable. In the circumstances, an affiliate may invoke the arbitration agreement entered into by another affiliated entity. *See Collins v. Int'l Dairy*

*Queen, Inc.*, 169 F.R.D. 690, 692-93 (M.D. Ga. 1997) ("When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement.") (quoting *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315 (4th Cir. 1988), quoted in *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993).

As a practical matter, allowing Plaintiff to assert that its claim is against Defendant MAINtag, Inc. (an entity nowhere identified in any of the contract documents) and to take discovery or pursue motion practice merely allows it to end run the Arbitration Provision.  As the Eleventh Circuit has noted, the question is whether "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided."  *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir. 1999) (citations omitted) (abrogated on other grounds).  That is precisely the situation here.  Equally, because no amendment of the Complaint can erase either the documentary record or the fundamental flaws in Plaintiff's pleading, its alternative prayer for leave to amend should be denied as futile.

11

## CONCLUSION

For all the reasons set forth above and in its initial moving papers, Defendant MAINtag, Inc. respectfully asks the Court to grant its motion to dismiss the Complaint, or, in the alternative, to compel arbitration and stay the action.

Respectfully submitted this the 11th day of September, 2013.

SCHIFF HARDIN, LLP

By: _s/ Ronald B. Gaither_____
    Ronald B. Gaither
    Georgia Bar No. 282292
    One Atlantic Center, Suite 2300
    1201 West Peachtree Street
    Atlanta, Georgia 30309
    (404) 437-7000
    *Attorneys for Maintag, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

TEGO, INC.,

        Plaintiff,

v.

MAINTAG, INC.,

        Defendant.

Case No. 1:13-cv-02241-TWT

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system, and a copy of same will be served electronically on the below listed counsel of record:

Eric S. Fisher
Taylor English Duma, LLC
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
efisher@taylorenglish.com

    *s/ Ronald B. Gaither*
    Ronald B. Gaither

23004-2524
NY\51815589.1

13